# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3868

_____

|                      |   |                                  |
|----------------------|---|----------------------------------|
| Martin Link,         | * |                                  |
|                      | * |                                  |
|     Appellant, | * |                     |
|                      | * | Appeal from the United States    |
|   v.       | * | District Court for the           |
|                      | * | Eastern District of Missouri.    |
| Al Luebbers,         | * |                                  |
|                      | * |                                  |
|     Appellee. | * |                      |

_____

Submitted: January 9, 2006
Filed: December 8, 2006

_____

Before WOLLMAN, JOHN R. GIBSON, and ARNOLD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Martin Link was found guilty by a jury of kidnapping, raping, and murdering eleven-year-old Elissa Self-Braun and was sentenced to death. He appeals from the district court's[1] judgment denying his petition for a writ of habeas corpus. We affirm.

_____

[1]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

## I.

Elissa Self-Braun disappeared in St. Louis on the morning of January 11, 1991. On January 15, her body was found in a drift pile near the St. Francis River in Wayne County, Missouri, approximately 130 miles from St. Louis. On January 26, 1991, Link was arrested following a high speed chase, which ended when Link crashed the stolen 1986 Ford Tempo he was driving into a utility pole.

Both of the examiners who performed autopsies on Elissa's body determined that Elissa had been sexually assaulted and strangled, but they were unable to determine conclusively whether Elissa died before her body was placed in the river. One of the examiners testified that the evidence indicated that Elissa had been strangled slowly, remaining conscious for up to five to ten minutes and dying within approximately thirty minutes.

Evidence connecting Link to Elissa's kidnapping, rape, and murder included a jar of petroleum jelly found in the stolen car that Link was driving. The jar bore Link's fingerprints. Genetic testing of blood found within the jar indicated that it was consistent with Elissa's DNA. Sperm found within Elissa's body was determined to match Link's DNA. An expert testified that the probability of both of these genetic samples matching by random chance was less than one in three hundred thousand. Fibers found on the front passenger seat of the car appeared to match the sweater Elissa was wearing when she was kidnapped. Link had grown up in the area where Elissa was kidnapped and had lived near the area where her body was found. Link had checked out of a motel near St. Louis on the morning Elissa disappeared. He checked into a hotel between Wayne County and St. Louis the next day. A witness at that hotel described the car Link was driving as sounding like it had a damaged muffler. Link brought this car into a mechanic's shop that afternoon and insisted that it be repaired quickly. Under the car, the mechanic found several clumps of orange

clay similar to the clay found in the St. Francis riverbed near where Elissa's body was found.

In addition, the mechanic noticed that the car's muffler, which had a clearance of approximately twelve inches from the ground, had been punctured by a collision with some object. Officers testified at trial that a twelve-inch-tall rock in the parking area near the St. Francis River appeared to have been recently moved out of place. In response to this evidence, Link called an accident reconstructionist, who testified that the damage to the car could not have been caused by the rock at the crime scene. In rebuttal, the state recalled Detective Michael Flaherty, who had testified in the state's case-in-chief. Detective Flaherty had examined the defense expert's report and had then performed his own reconstruction of the event with a car matching the model that Link was driving at the time of his arrest. Link objected to the admission of this evidence because of the state's failure to disclose the fact of this reconstruction, which was performed by Detective Flaherty prior to his earlier testimony. Link's objection was overruled, and Flaherty was permitted to testify.

Link was represented by a series of different attorneys during the preparation of his defense and his jury trial. Public defenders Kevin Curran and Cathy DiTraglia initially handled Link's case and performed substantial preliminary investigative work. In 1994, the Missouri Public Defender's system appointed Joseph Green and Scott Rosenblum, two private criminal defense attorneys, to take over Link's defense. Rosenblum was replaced by Ramona Martin. Martin handled the penalty phase of Link's defense while Green focused primarily on the guilt phase. Because of financial and caseload concerns, Martin withdrew from Link's defense approximately one month before the trial began and Vanessa Antoniou took her place. Although Antoniou, who had assisted one of the partners in her firm prepare some twenty murder cases during the three years she had been in the practice, had never previously tried a murder case, Green, who had tried approximately twelve capital cases, decided that it would be better if she presented the defense in the penalty phase. Green

thought that, as a woman, Antoniou would have more credibility with the jury in light of the fact that Link's offenses had been committed against women. Moreover, Green was concerned that the jury would find him less credible because of his role in the guilt phase. Green supervised Antoniou during the penalty phase and gave her advice and direction.

As part of their investigation of possible defense strategies, Link's attorneys asked Dr. Patricia Fleming to administer a psychological evaluation. Dr. Fleming advised the attorneys that she was unable to establish a rapport with Link and that he did not cooperate with her. She recommended that Link be examined by a black male, who might be better able to establish a rapport with him. Although Green was familiar with Dr. Donald Cross, a local psychological examiner who fit Dr. Fleming's recommendation, he and his co-counsel did not ask Dr. Cross to examine Link prior to the trial.

During the penalty phase, the state presented victim impact testimony from Elissa's father, mother, stepfather, stepmother, and sister. In addition, the state presented extensive evidence of Link's criminal history. The jury heard evidence that in 1982 Link had held a knife to the throat of a thirteen-year-old girl, had attempted to rape her, and then had forced her to perform oral sex on him. In 1983, Link kidnapped and raped a fifteen-year-old girl, leaving her under a bridge. For these crimes, Link was imprisoned until 1989. Later that year, he was arrested for soliciting a police officer for prostitution. On December 12, 1990, Link stole the Ford Tempo that he was driving at the time of his January 26, 1991, arrest. On January 23, 1991, Link stole a purse from a seventy-one-year-old woman and attempted to cash one of the checks found therein. Later that same day, he raped a woman at knife-point and kidnapped her. Two days later, he broke into a woman's home and robbed and raped her, holding a pillow over the woman's face and fleeing when he heard a noise. Later that day, Link attempted to grab an eight-year-old girl, but she fled. On January 26, 1991, the day of his arrest, Link entered an ice cream shop and demanded money from

a sixteen-year-old employee, threatening her with a knife and fleeing when she sounded an alarm.

The evidence presented by the defense in the penalty phase consisted of records from various institutions at which Link had been an inmate showing good conduct there and the testimony of an investigator with the state public defender's office recounting her inability to gather much useful information about Link.

During closing arguments, the prosecutor spoke at length about the crime spree that surrounded Elissa's murder, about Link's history of victimizing women and young girls, and about the brutality of this particular crime. In her closing, Antoniou pleaded for mercy, emphasizing the lack of available information about Link. She argued that it was immoral to kill someone whom the jury did not understand and that the jurors would be reduced to Link's level if they voted to kill him out of revenge or hate. Following the jury's recommendation of a sentence of death for Elissa's murder, the trial court sentenced Link to fifteen years on the kidnapping charge, to life on the rape charge, and to death on the murder charge.

After obtaining new counsel, Link filed a motion in state court for post-conviction relief. One of the grounds asserted was an allegation that his trial counsel had been ineffective in investigating Link's childhood and had failed to discover important mitigating evidence that might have persuaded the jury not to impose the death penalty. At the request of post-conviction counsel, Dr. Cross examined Link and issued a sixty-nine-page report that discussed several alleged instances of Link's being physically, sexually, and emotionally abused during his childhood. In addition, the report discussed Link's abuse of alcohol, marijuana, and inhalants dating back to preadolescence. Dr. Cross diagnosed Link as suffering from post-traumatic stress disorder. Link was also examined by Dr. William Logan, Dr. Robert Smith, and psychologist Marie Clark. Their assessments were consonant with Dr. Cross' conclusions.

At the hearing on the post-conviction petition, Green testified that he had no strategic reason not to have Link examined by another examiner, as Dr. Fleming had recommended. Both Green and Antoniou testified that it was Ramona Martin, whom neither side called as a witness at the hearing, who was assigned to handle the mitigation phase.

Following the court's denial of the post-conviction relief petition, Link's direct appeal was consolidated with his post-conviction appeal. The Missouri Supreme Court affirmed his conviction, sentence, and the denial of post-conviction relief. State v. Link, 25 S.W.3d 136 (Mo. 2000).

Link filed for federal habeas corpus relief, asserting twelve violations of his federal constitutional rights. Following the district court's denial of the petition, we granted a certificate of appealability on three issues: (1) whether Link received ineffective assistance of counsel because of counsel's failure to investigate and present mitigating evidence, (2) whether Link received ineffective assistance of appellate counsel because of counsel's failure to raise on appeal a claim regarding the trial court's decision to allow evidence on the issue of the testing done on the Ford Tempo, and (3) whether Link received ineffective assistance of appellate counsel because of appellate counsel's failure to allege constitutional violations stemming from trial counsel's failure to make a record regarding juror strikes.

## II.

In an appeal from a district court's denial of a habeas petition, we review the district court's conclusions of law *de novo* and its findings of fact for clear error. Lyons v. Luebbers, 403 F.3d 585, 592 (8th Cir. 2005). If the issues raised in the petition have been adjudicated on the merits in the state court proceeding, the petition must be denied "unless the state court disposition 'resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.'" Nooner v. Norris, 402 F.3d 801, 806 (8th Cir. 2005) (quoting 28 U.S.C. § 2254(d)). Link's claim of ineffective assistance of trial counsel was fully adjudicated on the merits in the state court proceeding. Link, 25 S.W.3d at 148-49. The Missouri Supreme Court correctly identified Strickland v. Washington, 466 U.S. 668 (1984), as the controlling legal standard. Id. As a result, we may overturn that court's legal conclusions only if they are objectively unreasonable. Honeycutt v. Roper, 426 F.3d 957, 960 (8th Cir. 2005).

To establish a claim of ineffective assistance of counsel, Link must demonstrate that (1) his trial counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) the deficiency in the trial counsel's performance was prejudicial to the defense. Strickland, 466 U.S. at 687-92. Because of the "distorting effects of hindsight," our highly deferential scrutiny of counsel's performance "indulge[s] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Our review of the state court determination that Link has not proved an ineffective assistance of trial counsel claim, then, is "twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel." Nooner, 402 F.3d at 808.

Link contends that his attorneys did not explore investigative options that might have produced valuable mitigation evidence. He also faults trial counsel for failing to present mitigation evidence at the penalty phase of his trial. Because an inadequate investigation can undermine the reasonableness of an otherwise sound tactical decision to not put on evidence, we address first Link's claim regarding counsel's failure to conduct a reasonable investigation.

This claim relies heavily on the psychological report prepared by Dr. Fleming. According to Dr. Fleming, the sexual nature of Link's crimes suggests that Link had been the victim of early sexual trauma. Dr. Fleming also stated, however, that her psychological assessment was incomplete and inadequate because she was not able to establish a rapport with Link. As recounted above, she recommended that Link be examined by a black male, who would stand a better chance of establishing an effective rapport. If his attorneys had followed through with Dr. Fleming's recommendation, Link argues, they would have uncovered valuable mitigation evidence. In support of this latter contention, Link points to psychological evaluations prepared for his petition for post-conviction relief, including the report prepared by Dr. Cross.

Under Strickland, trial counsel has a duty to conduct a reasonable investigation or to make a reasonable determination that an investigation is unnecessary. Sidebottom v. Delo, 46 F.3d 744, 752 (8th Cir. 1995). It is Link's burden to overcome the strong presumption that counsel's decision to forgo additional psychological testing was reasonable. Link asserts that Green's and Antoniou's testimony demonstrate that they had no strategic reason not to pursue further psychological examination, but neither Green nor Antoniou made this decision. According to the testimony, it was Martin who had primary responsibility for the penalty phase.[2] We have no testimony from Martin herself regarding her reasons for declining to pursue further psychological testing. In the absence of such testimony, we have no reason to believe that Martin's performance was anything other than "reasonable professional assistance." Nooner, 402 F.3d at 808.

This is not a case in which the record is clear that no reasonable attorney in Martin's position would have failed to pursue further psychological evidence.

---

[2]We note that it "is not deficient performance for a team of attorneys to divide among them the workload of a case in a rational and efficient manner." Bucklew v. Luebbers, 436 F.3d 1010, 1019 (8th Cir. 2006).

Contrast Rompilla v. Beard, 545 U.S. 374 (2005) (holding that defense counsel's failure to examine a readily available file that counsel knows the prosecution will cull for aggravating evidence was clearly unreasonable). As the Missouri Supreme Court observed, previous examiners had concluded that Link had no mental disease or defect and that he would repeat his criminal behavior and kill again if released. Link, 25 S.W.3d at 149. Another report opined that, based on his criminal record, Link had a fixation on having sex with young girls. In the light of this damaging information, it would have been reasonable for Martin to believe that it would be better to avoid what Green would later call a "a battle of experts" over Link's psychological makeup.[3]

Furthermore, the state post-conviction court found that Link's various attorneys had put a great deal of work into his case, including the mitigation phase, and that his attorneys had discussed various options, a finding that suggests that whatever Martin's precise thinking may have been, the decision to forgo additional testing was the product of thought and deliberation. Because the decision to not pursue further psychological examinations was not unreasonable on the face of the record and because there is no testimony that Martin acted in other than a professional manner, Link has failed to overcome the strong presumption that counsel acted reasonably.

Link's claim pertaining to the failure to present evidence is also unavailing because Green's decision to not put on psychological evidence was a matter of trial strategy. Ordinarily, we consider strategic decisions to be virtually unchallengeable unless they are based on deficient investigation, in which case the "presumption of sound trial strategy . . . founders on the rocks of ignorance." White v. Roper, 416 F.3d

---

[3]There is no suggestion that Martin was unaware of the prior reports. Nor would such a suggestion, absent supporting evidence, be plausible. As the state court concluded, Green knew of this material. It is unlikely that Green, who was presenting the guilt phase, was aware of this psychological information, but that Martin, who was responsible for mitigation, was not.

-9-

728, 732 (8th Cir. 2005). Because Link has failed to show that his attorneys' investigation was deficient, Green's tactical decision enjoys a strong presumption of reasonableness.

In response to the prosecutor's question, posed immediately prior to the start of the penalty phase, as to why the defense would not be calling any expert witnesses, Green responded:

> [A]s an officer of the court and as a counselor at law, I will represent to the court that as an attorney this is my fourteenth death penalty actual trial much less the number of death penalty cases I've handled, and I have used psychological testimony in the past in litigation cases, and at times I haven't. And based on my experience and training and information that's provided to me in this case through a number of different avenues, I have made a conscious decision not to put that on.

Green later stated that he had "made a conscious choice not to open the door to any evidence as to [Link's] personality disorders, or mental makeup," and then asked the trial judge to preclude the prosecution from introducing any testimony from its psychologist, a request that the court granted. In light of this testimony, the Missouri Supreme Court concluded that

> counsel's strategy was to keep out as much of Link's life as possible, and then preach a "sermon" against imposing the death penalty on someone they knew so little about. Ultimately, counsel made a conscious decision not to pursue or introduce psychological evidence and that decision was entirely a matter of trial strategy.

Link, 25 S.W.3d at 149. We conclude that this decision is not based upon an unreasonable determination of the facts and thus must be affirmed.

Moreover, even if the failure to pursue further psychological testing or present psychological evidence were missteps, the Supreme Court of Missouri concluded that Link suffered no prejudice. The court stated:

> [I]f Dr. Cross had testified, the state would have called its own expert, who would have presented devastating testimony about Link's state of mind. Further, Dr. Cross's report contained evidence that Link lied to Dr. Cross and tried to fake his test results, and it verifies other expert opinions that Link is anti-social, aggressive, and a serial rapist. On this record, there is no reasonable probability that the jury would have come to a different result.

Link, 25 S.W.3d at 149. We conclude that the state court's holding resulted in a decision that was neither contrary to nor involved an unreasonable application of clearly established federal law. Nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Moreover, while it is true that Link's childhood may have been marked by incidents of abuse, as noted in Dr. Cross' report, they do not compare with those described in Rompilla. See 545 U.S. 374, 391-92 (2005) (citing Rompilla v. Horn, 355 F.3d 233, 279 (3d Cir. 2004) (Sloviter, J., dissenting)). Thus, we cannot say that the now-tendered evidence might well have influenced the jury's appraisal of Link's culpability, and so, the likelihood of a different outcome had the evidence been presented is not sufficient to undermine our confidence in the verdict reached by the jury. Cf. Id. at 393 (holding that confidence in a jury's vote for a death sentence is undermined if the jury might well have reached a different verdict had the omitted mitigating evidence been presented). It bears mention that Link had already been sentenced to multiple terms of life in prison for two rapes he committed in January 1991. A jury could very well conclude that a life sentence would not result in any additional punishment for the death of this eleven-year-old child. Accordingly, because Link has not met his burden under either the performance or prejudice prongs of Strickland, his claims fail.

-11-

## III.

Turning to his claim for ineffective assistance of appellate counsel, Link must fulfill the Strickland requirements by showing that his counsel was unreasonably deficient and that his defense was prejudiced by this deficiency. See Smith v. Robbins, 528 U.S. 259, 285 (2000). When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain a ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims. Id. at 288. Because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue. Charron v. Gammon, 69 F.3d 851, 858 (8th Cir. 1995). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Smith, 528 U.S. at 288 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)).

## A.

Link's first claim of ineffective assistance of appellate counsel is based on counsel's failure to challenge on direct appeal the admission of the state's accident reconstruction evidence. Link argues, based on Wardius v. Oregon, 412 U.S. 470 (1973), that the admission of this evidence was fundamentally unfair because the state had not disclosed this evidence to the defense, while the defense was forced to disclose to the state its expert reconstruction evidence.

This claim fails for two reasons. First, Link does not compare the strength of this claim relative to those claims that were asserted on appeal. As a result, he cannot overcome the presumption that appellate counsel acted properly in making a strategic decision to focus on other claims. Second, Link is unable to establish prejudice, because it appears unlikely that the Missouri courts would have overturned his

conviction based on this argument. Under Missouri case law interpreting Wardius, rebuttal witnesses need not generally be disclosed unless they are called to refute an alibi or a defense of mental disease or defect. State v. Clark, 975 S.W.2d 256, 263 (Mo. Ct. App. 1998). Moreover, discovery violations do not warrant reversal unless they result in fundamental unfairness or prejudice to the defendant's substantial rights. State v. Cook, 5 S.W.3d 572 (Mo. Ct. App. 1999). In the light of these decisions and the overwhelming evidence of Link's guilt independent of the now-challenged rebuttal evidence, we conclude that Link has not shown "a reasonable probability that, but for his counsel's unreasonable failure [to assert this claim], he would have prevailed on his appeal." Smith, 528 U.S. at 285.

**B.**

Link also argues that appellate counsel was deficient for failing to assert error in the trial court's decision to strike a juror that Link asserts was qualified and for failing to strike two jurors that Link asserts were unqualified. In addition, Link claims that appellate counsel should have, in the state post-conviction relief appeal, asserted that trial counsel was ineffective for failure to make a sufficient record.

Link's claim, insofar as it applies to a deficiency in his post-conviction relief appeal, is not grounds for federal habeas corpus relief. There is no federal constitutional right to the effective assistance of post-conviction counsel. Clay v. Bowersox, 367 F.3d 993, 1005 (8th Cir. 2004). In Missouri, where the direct appeal and post-conviction relief appeal are often consolidated, the appellant is therefore entitled to effective assistance of counsel only on that portion of the appeal that is devoted to direct appeal issues. Id.

Thus, we focus solely on Link's assertion that appellate counsel should have asserted a jury selection claim as part of the direct appeal. Once again, Link has not established the strength of this claim relative to the claims that were asserted by

-13-

appellate counsel. He is therefore unable to overcome the strong presumption that appellate counsel made a reasonable strategic decision not to press this particular claim. Such a strategic decision is certainly within the reasonable range of choices an appellate advocate might make, given the deficient record created on this issue by the trial counsel and the fact that neither of the jurors about whom Link complains ultimately served on the jury.

The judgment is affirmed.

_____