# United States Court of Appeals
## For the Eighth Circuit

_____

No. 10-2579
_____

Marcellus S. Williams

*Petitioner - Appellee*

v.

Donald Roper

*Respondent - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 13, 2011
Filed: September 18, 2012

_____

Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Marcellus Williams was convicted by a jury in Missouri of the first-degree murder of Felicia Gayle and sentenced to death. The Supreme Court of Missouri affirmed the conviction and sentence on direct review, *State v. Williams*, 97 S.W.3d 462 (Mo. 2003) ("*Williams I*"), and subsequently affirmed the denial of his motion for postconviction relief. *Williams v. State*, 168 S.W.3d 433 (Mo. 2005) ("*Williams*

*II*").  Williams petitioned for a writ of habeas corpus in the district court under 28 U.S.C. § 2254.  The district court denied relief on twelve of Williams's claims, but granted relief on his claim of ineffective assistance of counsel at the penalty phase of trial.  The State appeals the grant of relief, and we reverse.

I.

On August 11, 1998, Marcellus Williams drove his grandfather's car to a bus stop and traveled by bus to University City, Missouri.  Once in University City, Williams began looking for a house to burglarize, and came upon the home of Felicia Gayle.  After knocking on the front door and receiving no answer, Williams knocked out a window pane near the door, reached in and unlocked the door, and entered Gayle's home.  Williams heard water running in the shower on the second floor, so he went into the kitchen, found a butcher knife, and waited.

Gayle finished her shower and went downstairs.  Williams attacked Gayle, stabbing and cutting her forty-three times, and inflicting seven fatal wounds.  Williams then washed Gayle's blood from his body and concealed his bloody shirt with a jacket.  Before leaving Gayle's home, he took Gayle's purse, which contained, among other things, a *St. Louis Post-Dispatch* ruler and a calculator, and her husband's laptop computer.

Williams returned to the bus stop, retrieved his grandfather's car, and picked up his girlfriend, Laura Asaro.  Asaro noticed that Williams was wearing a jacket, despite the summer heat.  When Williams removed the jacket, Asaro noticed blood on his shirt and scratches on his neck.  Asaro questioned him, and Williams claimed he had been in a fight.  Asaro also saw a laptop computer in the car.  Later that day, Williams put his bloody clothes in his backpack and threw them into a sewer drain.

The next day, Asaro tried to retrieve some items from the trunk of Williams's car, but he tried to prevent her from opening it. Before he could push her away, Asaro grabbed Gayle's purse from the trunk. Inside the purse she found Gayle's Missouri state identification card and a black coin purse. Asaro confronted Williams about the purse, and Williams confessed that he had killed Gayle. He explained in detail how he had waited for her in the kitchen with a butcher knife, and that when she came downstairs, he stabbed her in the arm and neck, twisting the knife as he went. After confessing the details to Asaro, Williams grabbed her by the throat and threatened to kill her, her children, and her mother if she told anyone.

On August 31, 1998, Williams was arrested on unrelated charges and incarcerated at the St. Louis City Workhouse, where he shared a room with Henry Cole for a period of time. While watching television one evening, Cole and Williams saw a news report about Gayle's murder. After the news report, Williams told Cole that he had committed the murder. Over the next few weeks, Williams and Cole had several conversations about the crime, during which Williams provided considerable details about the break-in and murder. After Cole was released from jail in June of 1999, he went to the University City police and told them about Williams's involvement in Gayle's murder.

As a result of the information provided by Cole, University City police contacted Asaro about the murder. Asaro told the police that Williams admitted to her that he had killed Gayle. The police then searched Williams's grandfather's car and found Gayle's *Post-Dispatch* ruler and calculator. The police also recovered Gayle's husband's laptop, which Williams had sold after the murder.

The State charged Williams with several offenses and sought the death penalty. Williams was tried and convicted of first-degree murder, first-degree burglary, first-degree robbery, and two counts of armed criminal action.

In preparation for the penalty phase of the trial, Williams's attorneys, Joseph Green and Chris McGraugh, hired multiple experts, including a mitigation specialist. The mitigation specialist collected records on Williams and his family, and introduced Green and McGraugh to Williams's family so that the attorneys could collect information about his childhood development and family history.

During the penalty phase, the State presented extensive evidence of Williams's criminal history. The jury heard testimony detailing a residential burglary in 1997, armed robberies of both a doughnut shop and a Burger King in 1998, and a threat to kill a corrections officer at the St. Louis City Workhouse in 1999. The State also introduced certified copies of Williams's sixteen convictions: second degree burglary and stealing over $150 in 1988; second degree assault in 1988; second degree burglary in 1988; two counts each of second degree burglary and stealing over $150 in 1991; first degree robbery, armed criminal action, and unlawful use of a weapon in 2000; and first degree robbery, armed criminal action, stealing a motor vehicle, and two counts of false imprisonment in 2000. The State completed its presentation with victim impact evidence from Gayle's family and friends.

In mitigation, Williams's counsel presented evidence that Williams was a caring and loving father, and that his execution would have a significant effect on his family. The defense presented testimony from several of Williams's family members and friends, including his son, his step-daughter, his mother, his aunt, his brothers, and others. They testified about Williams's positive relationship with his son and step-daughter. This evidence included testimony that the continued contact and visitation with Williams made the children feel loved, and that Williams would encourage the children to read and do well in school. Williams's counsel also attempted to present testimony from Dr. Mark Cunningham that Williams's continued relationship with his children would have a positive impact on them and that his execution would have a negative impact on them, but the trial court found the evidence inadmissible. According to Williams's counsel, their theory of defense for

-4-

the penalty phase was residual doubt; they hoped the jury would have a lingering doubt about Williams's guilt and impose a life sentence.

The jury deliberated for less than two hours and returned a sentence of death. In doing so, the jury found the existence of ten aggravating circumstances: that the murder involved depravity of mind; that Williams committed the murder during a burglary; that Williams committed the murder during a robbery; that Williams committed the murder in order to receive money or something of value from Gayle; that Williams committed the murder in order to prevent his lawful arrest; and each of five prior convictions committed by Williams—second degree assault in 1998, first degree robbery in 2000 and 2001, and armed criminal action in 2000 and 2001. *See Williams I*, 97 S.W.3d at 473.

Williams appealed to the Supreme Court of Missouri, which affirmed the conviction and sentence. *Id*. at 466. The Supreme Court of the United States denied Williams's petition for a writ of certiorari. *Williams v. Missouri*, 539 U.S. 944 (2003).

On May 30, 2003, Williams filed a *pro se* motion for postconviction relief in the Circuit Court of St. Louis County, Missouri, pursuant to Supreme Court of Missouri Rule 29.15, and appointed counsel filed an amended motion on September 8, 2003. One of the several grounds asserted by Williams was that his trial counsel was ineffective for failing to investigate and present mitigating evidence of Williams's traumatic childhood.

In support of this claim, Williams asserted that his trial counsel intended to present expert testimony to explain Williams's social history and criminal conduct, but the psychologist they hired was unable to establish a rapport with Williams because he was hired too late. According to Williams, if his counsel had properly investigated his background, they would have uncovered and introduced the

following significant mitigating evidence: that Williams was subjected to brutally violent physical and sexual abuse by family members; that he was abandoned and resented by his parents; that his family condoned and encouraged criminal behavior and substance abuse; that he came from an impoverished and dysfunctional household; and that he was exposed to guns, drugs, and alcohol at a young age. This evidence also would have included testimony from Dr. Donald Cross, who diagnosed Williams as suffering from significant mental illnesses, including depression, drug and alcohol dependence, and post-traumatic stress disorder. According to Dr. Cross, these disorders, which went untreated, contributed to Williams's criminal behavior, and Williams "was under the influence of extreme mental or emotional disturbance and circumstantial conditions [such] that his ability to appreciate the wrongfulness of his actions or conform his behavior to the law was substantially impaired."

The postconviction court did not hold an evidentiary hearing on this claim, but Williams's trial counsel, Green, submitted an affidavit in support of Williams's motion. Green stated that he did not have sufficient time to prepare for Williams's trial, because he was having problems getting discovery from the State and was working on another death penalty case. Green further averred that if he had obtained a diagnosis from Dr. Cross, he would have presented the evidence at trial, along with testimony from Williams's family.

The postconviction court denied Williams's petition. The court explained that Williams alleged that trial counsel should have presented evidence to explain mitigating factors such as Williams's "complete social history, abusive childhood, drug and alcohol abuse, oppositional defiant disorder, and post-traumatic stress disorder." The court concluded, however, that the presentation of this mitigating evidence would have conflicted with counsel's reasonable trial strategy of presenting Williams as a "family man, who is innocent of such a violent murder." The court also ruled that there was "no reasonable probability that the omitted evidence would have

changed the result of [Williams's] sentencing." Williams appealed, and the Supreme Court of Missouri unanimously affirmed. *Williams II*, 168 S.W.3d at 443.

On August 29, 2006, Williams filed a federal habeas corpus petition that raised thirteen grounds for relief. The district court denied relief as to twelve of the claims, but granted relief on Williams's claim that his trial counsel was ineffective at the penalty phase for failing to conduct an adequate investigation and present evidence regarding his background and social and medical history. The district court held that Williams's counsel was constitutionally ineffective, and that the decision of the Supreme Court of Missouri was contrary to *Wiggins v. Smith*, 539 U.S. 510 (2003), because "[t]rial strategy cannot excuse defense counsel's failure to perform a thorough investigation of a defendant's background in a death penalty case." The court also determined that if the evidence of Williams's family, social, and mental history had been presented at trial, then there was "a reasonable probability that the outcome of the penalty phase would have been different."

II.

In an appeal from a district court's grant of a habeas petition, we review the district court's legal conclusions *de novo*. *See Jackson v. Norris*, 651 F.3d 923, 925 (8th Cir. 2011). When a claim has been adjudicated on the merits in state court proceedings, habeas relief is permissible under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), only if the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Williams's claim is governed by AEDPA and the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which require that a defendant alleging a violation of the Sixth Amendment right to counsel must show both that counsel's performance was deficient and that the deficiency prejudiced the defendant. *Id*. at 687. Because resolution of the first prong is unnecessary to our decision, we assume for the sake of analysis that the Supreme Court of Missouri unreasonably applied clearly established federal law in holding that the performance of Williams's counsel was within "the wide range of professionally competent assistance." *Id*. at 690.

## A.

We focus our analysis on the second prong of *Strickland*—whether the alleged deficiencies in counsel's performance prejudiced Williams. Prejudice exists under *Strickland* if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Under AEDPA, if a *Strickland* claim is adjudicated on the merits in state court proceedings, and there is no challenge to the factual determinations of the state courts, then a federal court may grant relief only if a state court's decision is contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

In the state court proceedings, the Missouri courts adjudicated both prongs of Williams's ineffective-assistance claim on the merits. The postconviction court concluded first that trial counsel's defense strategy was reasonable, and that Williams could not establish ineffective assistance by alleging that a different strategy would have worked better. Second, the postconviction court ruled, citing *Strickland*, that

"there is no reasonable probability that the omitted evidence would have changed the result of Movant's sentencing." The Supreme Court of Missouri affirmed. The state supreme court, also citing *Strickland*, set out the standards for a claim of ineffective assistance of counsel, including that to establish prejudice, a movant "must show that, but for counsel's poor performance, there is a reasonable probability that the outcome of the court proceeding would have been different." 168 S.W.3d at 439. After noting Williams's claim that trial counsel failed to introduce sufficient evidence of his social history and discussing trial counsel's strategy, the state supreme court explained: "The motion court found that an abusive childhood defense would have been inconsistent with the penalty phase strategy and would not have changed the jury's sentence. The motion court did not clearly err in denying this claim without an evidentiary hearing." *Id*. at 443.

Although the ineffective-assistance claim was adjudicated on the merits, the district court failed to apply deference under 28 U.S.C. § 2254(d) when considering whether Williams had established prejudice from the alleged deficient performance of trial counsel. The district court proceeded as though the claim were subject to *de novo* review under *Strickland*, holding that the proffered evidence, if presented at trial, "would establish a reasonable probability that the outcome of the penalty phase would have been different." This was error. The proper question before the federal courts under AEDPA is whether the decision of the Supreme Court of Missouri on the question of prejudice was contrary to, or an unreasonable application of, clearly established federal law. If the state court's determination passes muster under this standard, then Williams is not entitled to relief.

Taken together, AEDPA and *Strickland* establish a "doubly deferential standard" of review. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011) (internal quotation omitted). First, under *Strickland*, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is "reasonably likely" that the result would have been

different absent the errors. *Strickland*, 466 U.S. at 696. The *Strickland* prejudice standard is less demanding than a more-probable-than-not standard, but the difference is "slight and matters only in the rarest case." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011) (internal quotation omitted). To satisfy *Strickland*, the likelihood of a different result must be "substantial, not just conceivable." *Id.* Under AEDPA, we must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the *Strickland* standard is unreasonable, not merely whether it is incorrect. *Id.* at 785. This standard was meant to be difficult to meet, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

In reviewing whether the state court's decision involved an unreasonable application of clearly established federal law, we examine the ultimate legal conclusion reached by the court, *id.* at 784, not merely the statement of reasons explaining the state court's decision. *See Gill v. Mecusker*, 633 F.3d 1272, 1291-92 (8th Cir. 2011); *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002); *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001); *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997). At least where there is no "conspicuous misapplication of Supreme Court precedent" that makes the state court's decision "contrary to" clearly established law, *Wright*, 278 F.3d at 1256 n.3, the proper question is whether there is "any reasonable argument" that the state court's judgment is consistent with *Strickland*. *Richter*, 131 S. Ct. at 788; *see Premo v. Moore*, 131 S. Ct. 733, 740 (2011). If the state court "reasonably could have concluded that [the petitioner] was not prejudiced by counsel's actions," then federal review under AEDPA is at an end. *Moore*, 131 S. Ct. at 744.

Williams argues that the state supreme court's decision was "contrary to" clearly established federal law, because the court characterized the decision of the

-10-

postconviction court as a finding that Williams's proffered evidence "would not have changed the jury's sentence." *Williams II*, 168 S.W.3d at 443. This recounting of the postconviction court's decision omits the phrase "reasonable probability" from the calculus. As a consequence, Williams contends, the Supreme Court of Missouri issued a decision contrary to *Strickland* and other Supreme Court precedents when it affirmed the postconviction court's ruling.

We reject this contention. The postconviction court recited the standard correctly in its decision, saying there was "no reasonable probability that the omitted evidence would have changed the result." The state supreme court, when framing the inquiry on appeal, likewise recited the *Strickland* standard precisely, saying that a movant must show a "reasonable probability" of a different outcome. As in *Woodford v. Visciotti*, 537 U.S. 19 (2002), where the state court sometimes used the term "probable" without the modifier "reasonable," the Missouri court's "shorthand reference" to the *Strickland* standard later in its opinion "may perhaps be imprecise, but if so it can no more be considered a repudiation of the standard than can [the Supreme] Court's own occasional indulgence in the same imprecision." *Id*. at 23-24. We are satisfied that the state courts understood the familiar *Strickland* standard and issued a decision that was not contrary to established federal law. *See White v. Roper*, 416 F.3d 728, 732-33 (8th Cir. 2005); *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006); *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 785-86 (11th Cir. 2003).

We also conclude that the decision of the Supreme Court of Missouri did not involve an unreasonable application of *Strickland*, because the state court reasonably could have concluded that Williams was not prejudiced by the alleged deficiencies of counsel. The jury had strong reasons to choose a sentence of death over life imprisonment. The State presented substantial aggravating evidence. The jury heard the gruesome details of Gayle's murder during the guilt phase. Williams stabbed her forty-three times, inflicting seven fatal wounds and twisting the knife as he went. And in the penalty phase, the State presented Williams's extensive criminal record,

-11-

which included sixteen convictions, along with detailed evidence of Williams's multiple armed robberies and threat to kill a corrections officer. As a result, the jury found the existence of ten statutory aggravating factors in sentencing Williams to death.

Williams argues that the undiscovered mitigating evidence was so strong that the state court's determination of no prejudice was unreasonable. The new evidence was designed to show that Williams was subjected to severe physical and sexual abuse as a child, and was diagnosed with depression, post-traumatic stress disorder, and drug and alcohol dependence. According to Williams, this evidence would have provided the jury with an explanation for Williams's criminal history, and would have lessened Williams's moral culpability in the eyes of the jurors. He also argues that the evidence would have allowed jurors to find the existence of two statutory mitigating factors—that Williams was under the influence of extreme mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Mo. Rev. Stat. § 565.032.3(2), (6).

The state court, however, reasonably could have questioned the weight of Williams's proposed mitigating evidence. First, any testimony from Williams would be susceptible to impeachment. In a deposition during state postconviction review, Williams acknowledged that he had lied under oath in 1987 in order to secure a favorable plea agreement. When asked if he would lie under oath "when it suits [him]," he responded, "I mean, you should know better than me." Second, any testimony by Dr. Cross about his diagnosis of Williams could have opened the door to additional aggravating evidence, such as Williams's prison disciplinary record—he committed more than 100 violations while incarcerated, including verbal and physical altercations with inmates and corrections officers—or rebuttal from a state expert to refute the Cross diagnoses. *See Pinholster*, 131 S. Ct. at 1410; *Wong v. Belmontes*, 130 S. Ct. 383, 389-90 (2009). The undiscovered evidence also could act as a

double-edged sword, as the jurors could have concluded that Williams was "simply beyond rehabilitation" and a threat of future dangerousness because of his background and mental illnesses. *See Pinholster*, 131 S Ct. at 1410; *cf. Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

A jury in a Missouri capital case is instructed to consider "whether the evidence as a whole justifies a sentence of death or a sentence of life imprisonment without eligibility for probation, parole, or release except by act of the governor." Mo. Rev. Stat. § 565.032.1(2). The postconviction record here includes the aggravating and mitigating evidence presented at trial and sentencing, and the new mitigating evidence that Williams proffered in postconviction proceedings. Given the strength of the case in aggravation and the countervailing considerations with respect to the new mitigating evidence, we believe the Supreme Court of Missouri and the postconviction court reasonably concluded that there was not a reasonable probability that trial counsel's alleged deficiencies affected the outcome of the trial.

B.

The dissent asserts that we should apply *de novo* review to the prejudice prong of the *Strickland* claim, because "we are here presented with an explicit decision by the state court that is an unreasonable application of clearly established federal law." *Post*, at 37. The dissent concludes that even though there may have been a reasonable basis for the state court to deny relief, *post*, at 48, we may not consider that basis when applying § 2254(d)(1), because the state court assertedly gave a different reason. According to the dissent, "both state courts considered only whether the new mitigating evidence could have fit within the family-man/residual-doubt theory that was actually offered." *Post*, at 42. On this basis, the dissent would review *de novo* whether Williams was prejudiced by the alleged ineffective assistance of counsel, and order the granting of a writ. We disagree with the dissent's characterization of the state court decisions and with its narrower vision of deference under AEDPA.

The state postconviction court, after three paragraphs discussing whether trial counsel's performance was deficient, concluded as follows:

> Movant cannot now plead ineffective assistance alleging that a different strategy would have worked better. *Furthermore*, there is no reasonable probability that the omitted evidence would have changed the result of Movant's sentencing. State v. Carter, 955 S.W.2d 548 (Mo. banc 1997); Strickland v. Washington, 466 U.S. 668, 699-700 (1984).

State Ex. 33, at 802 (emphasis added).

"Furthermore" means "in addition to what precedes." *Webster's Third New International Dictionary* 924 (2002). It is not a synonym of "Thus," or "Therefore," the use of which might have indicated that the postconviction court's decision on prejudice was dependent on its analysis of counsel's performance. In deciding whether Williams could show prejudice, the postconviction court did not say, as the dissent would have it, that it "considered only whether the new mitigating evidence could have fit within the family-man/residual-doubt theory that was actually offered." *Post*, at 42. The court said "there is no reasonable probability that the omitted evidence would have changed the result of [Williams's] sentencing." For all we know, the postconviction court reached its conclusion of no prejudice after weighing the new mitigating evidence and the aggravating factors, just as we conclude it reasonably could have done.

The Supreme Court of Missouri, in summarizing the decision of the postconviction court, simply combined the lower court's two conclusions into one sentence: "The motion court found that an abusive childhood defense would have been inconsistent with the penalty phase strategy *and* would not have changed the jury's sentence." 168 S.W.3d at 443 (emphasis added). The court did not say that the postconviction court's rulings on the two prongs were interdependent. The state supreme court's ultimate decision, moreover, was conclusory: "The motion court did

-14-

not clearly err in denying this claim without an evidentiary hearing." *Id*. Again, for all we know, the state supreme court determined that the aggravating factors substantially outweighed the new mitigating evidence, and concluded for that reason that the motion court "did not clearly err" in denying Williams's claim without a hearing. On the issue of prejudice, there is no material distinction between the one-sentence unexplained conclusions of the state courts in this case and the summary ruling at issue in *Harrington v. Richter*, 131 S. Ct. 770. Even on the dissent's view of AEDPA, therefore, Williams's burden on the prejudice question should be to show that "there was no reasonable basis for the state court to deny relief." *Id*. at 784.

In any event, even assuming the state supreme court's opinion on prejudice should be taken to mean what the dissent suggests, we disagree with the dissent's view about the scope of our deference to state court decisions under AEDPA. Under the dissent's approach, a petitioner's entitlement to relief may well depend on whether the state court writes an opinion. If the state court summarily denies a claim of prejudice, then a petitioner is required to show that there was no reasonable basis for the state court's decision. *Richter*, 131 S. Ct. at 784. But on the dissent's view, if the state court gives one reason for the decision, then the petitioner can obtain relief if *the specific reason articulated* is not a reasonable basis to reject his claim. This approach, which reads "unreasonable" in § 2254(d) "as having reference to the quality of the reasoning process articulated by the state court" would "place the federal court in just the kind of tutelary relation to the state courts that [AEDPA was] designed to end." *Hennon*, 109 F.3d at 335.

The Supreme Court's recent decision in *Premo v. Moore*, 131 S. Ct. 733, is instructive. The petitioner there pleaded guilty in state court, but argued in postconviction proceedings that his counsel was ineffective for failing to move to suppress a confession. The Oregon postconviction court rejected the claim and entered an order with findings of fact and conclusions of law. *Moore v. Palmateer*, No. 98C-15019 (Ore. Cir. Ct. June 19, 2000), *reprinted in* App. to Pet. for Cert. at

-15-

198, *Moore*, 131 S.Ct. 733 (No. 09-658). The Oregon Court of Appeals affirmed without opinion, *Moore v. Palmateer*, 26 P.3d 191 (Or. Ct. App. 2001), and the Oregon Supreme Court denied review, *Moore v. Palmateer*, 30 P.3d 1184 (Or. 2001), so it is presumed that the postconviction court's rationale prevailed in the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Mark v. Ault*, 498 F.3d 775, 783 (8th Cir. 2007).

The state postconviction court in *Moore* reasoned as follows:

The Court notes that counsel rebutted petitioner's complaint that counsel should have moved to suppress petitioner's confession. Counsel offered two reasons for not filing the motion. Counsel asserts it was clear that petitioner was not in custody when he gave his confession, noting that petitioner "never believed that he was in custody and admitted to me that he realized he was not in custody when he and his brothers and another friend voluntarily came to the police department to give the recorded statement." Because petitioner was not in custody when he gave his statement, there was no basis for filing a motion to suppress.

Counsel further explains that he did not move to suppress because petitioner had previously confessed his participation in the crime to his brother (Raymond Moore) and another friend. Both Raymond Moore and the friend could have been called as witnesses to repeat petitioner's confession. A motion to suppress would have been fruitless.

The Court finds that there is very little chance that petitioner's confession would have been suppressed. Given petitioner's confession, counsel obtained the best plea offer he could for petitioner and petitioner accepted the offer after careful consideration.

\*　　\*　　\*

Based on the findings of fact set forth above, in the underlying criminal proceedings resulting in petitioner's conviction, petitioner was not denied the right to assistance of counsel, as guaranteed by either the

-16-

United States Constitution and as articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), or the Constitution of the State of Oregon.

*Moore v. Palmateer*, No. 98C-15019 (Ore. Cir. Ct. June 19, 2000) (internal record citations omitted), *reprinted in* App. to Pet. for Cert., *supra*, at 204-06; *see Moore v. Czerniak*, 574 F.3d 1092, 1098 (9th Cir. 2009); *see also* J.A. at 139-40, *Moore*, 131 S.Ct. 733 (No. 09-658), 2010 WL 2569197.

When the Supreme Court considered the petitioner's claim for relief, the Court did not limit its analysis to the specific reasoning of the state postconviction court set forth above, including the findings that "there is very little chance that petitioner's confession would have been suppressed," and that any "motion to suppress would have been fruitless." Rather, the Court concluded that "[t]he state court here *reasonably could have determined* that Moore would have accepted the plea agreement even if his second confession had been ruled inadmissible." *Moore*, 131 S. Ct. at 744 (emphasis added). After explaining why that determination would have been reasonable, the Court reiterated that "[t]he state postconviction court *reasonably could have concluded* that Moore was not prejudiced by counsel's actions. Under AEDPA, that finding ends federal review." *Id*. at 745 (emphasis added).

The dissent contends that we should grant more deference to "indeterminate" state-court decisions than to "explicit" state-court decisions, *post*, at 37-39, and argues that *Moore* is in the former category because the state court "did not specify" whether its ruling was based on a determination of no deficient performance, no prejudice, or both. *See* 131 S. Ct. at 740. We are not convinced that the Supreme Court would have taken a different approach in *Moore* if the state court had specified in its order that the petitioner suffered no prejudice. The Court must have assumed for purposes of analysis that the state court reached the issue of prejudice under *Strickland*, for otherwise the opinion would have examined this element of the claim

*de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins*, 539 U.S. at 534. The significance of *Moore* is that the Court focused on what the state court "reasonably could have concluded" about prejudice, not on whether the specific reasons articulated by the state court were a reasonable basis for denying relief on the prejudice prong.[1]

The Eleventh Circuit addressed the scope of AEDPA in the wake of *Richter* and *Moore*. The court affirmed a district court's denial of habeas corpus relief, even though the district court relied on grounds other than those articulated by the state court. *Gill*, 633 F.3d at 1292. The Eleventh Circuit explained that "the statutory language focuses on the result, not on the reasoning that led to the result." *Id*. The court therefore concluded that "[n]othing in the language of AEDPA required the district court to evaluate or rely upon the correctness of the state court's process of reasoning." *Id*.; *see also Jardine v. Dittmann*, 658 F.3d 772, 777 (7th Cir. 2011) ("This court must fill any gaps *in the state court's discussion* by asking what theories

---

[1]The dissent's reliance on *Early v. Packer*, 537 U.S. 3 (2002) (per curiam), *post*, at 38, conflates the distinct "contrary to" and "unreasonable application" clauses of § 2254(d)(1). *See also post*, at 43 (citing *Frantz v. Hazey*, 533 F.3d 724, 739 (9th Cir. 2008) and *Young v. Sirmons*, 486 F.3d 655, 674 (10th Cir. 2007)). The Supreme Court's reference in *Packer* to "the reasoning" of state-court decisions came in a paragraph explaining when "[a] state court's decision is *'contrary to'* [the Supreme Court's] clearly established precedents." *Id*. at 8 (emphasis added) (internal quotation omitted). A federal habeas court may consider a state court's reasoning in determining whether it "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases,'" such as where a state court deciding an ineffective-assistance claim fails to apply *Strickland* altogether. *Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). But that is quite different from holding that a state court's decision involves "an unreasonable application" of Supreme Court precedent when it is not contrary to clearly established law, and there is a reasonable basis for the decision to deny relief.

'could have supported' the state court's conclusion.") (emphasis added) (citing *Richter*, 131 S. Ct. at 786).[2]

As we understand *Richter* and *Moore*, the Court's opinions were premised the text of § 2254(d) and the meaning of "decision" and "unreasonable application," not on speculation about whether the state court actually had in mind reasons that were "reasonable" when it denied relief. But even if we assume that deference to the state court's decision is warranted only when there is some possibility that the court specifically contemplated "reasonable" grounds for denying relief, the issuance of a written opinion with deficient reasoning does not eliminate such a possibility. Just as there is more than one way to skin a cat, there often is more than one way to resolve an appeal, and not every possible approach makes it into an opinion. A court may well leave the existence of alternative grounds unstated, because discussion of those grounds is unnecessary to the decision.

Yet a state court is not like an administrative agency to which a federal court can remand a case for a more complete explanation. *See Hennon*, 109 F.3d at 335. The granting of an application for writ of habeas corpus sets aside the judgment of another sovereign, often many years after the proceedings are concluded, and requires the State to begin the proceedings anew. The strong federalism considerations that underlie AEDPA are well known: Federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to

---

[2]To support its view that a federal court applying § 2254(d) may consider only reasons articulated by a state court, the dissent, *post*, at 38 & n.8, 43, relies on footnote in a different Eleventh Circuit case, *Johnson v. Sec'y, DOC*, 643 F.3d 907 (11th Cir. 2011). *Johnson*, however, concluded only that the "no reasonable basis" language from *Richter* did not apply when considering *Strickland* prejudice in that case, because the state court *did not even rule* on the prejudice prong of *Strickland*. *Id*. at 930 & n.9 (citing *Rompilla*, 545 U.S. at 390, *Wiggins*, 539 U.S. at 534, and *Ferrell v. Hall*, 640 F.3d 1199, 1224-27 (11th Cir. 2011)).

punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Richter*, 131 S. Ct. at 787 (internal quotation omitted). It is understandable that Congress would not require state courts to choose between issuing summary rulings or filing opinions with multiple alternative holdings in order to enjoy the full measure of deference under the "unreasonable application" clause of § 2254(d).[3]

## C.

In reaching our conclusion that the decision of the state courts did not involve an unreasonable application of Supreme Court precedent, we are mindful that a determination about prejudice is not an exact science. The analysis requires a predictive judgment about how jurors would consider a different record of mitigating evidence, and then an assessment of the range of reasonableness that is available to state courts under AEDPA. The meaning of "prejudice" and "reasonableness" are informed by previous decisions that have considered similar problems. Therefore, we have compared the record in this case with prior decisions of the Supreme Court that have addressed a state court's finding of no prejudice under AEDPA in capital cases. An analysis of these cases, as well as precedent of this circuit, fortifies our conclusion that the state supreme court's decision was not unreasonable.

---

[3]The dissent also suggests, *post*, at 39-40, that even if we are correct in our understanding of AEDPA, we should nonetheless rule to the contrary, because the Supreme Court has not yet addressed the specific question raised here. If there is indeed an open question presented, then we perceive no thumb on the scales that requires us to eschew the better answer. Nor does it advance the dissent's cause to say that our conclusion would "step ahead of the Court's rulings," *post*, at 40, for that is true *whenever* the inferior courts must decide a question on which the Supreme Court has not spoken directly, no matter which way the question is decided.

The Supreme Court has addressed a comparable question in three cases. In one, *Porter v. McCollum*, 130 S. Ct. 447 (2009), the Court held that the state court unreasonably determined that a petitioner had not suffered prejudice. But in that case, the aggravating evidence did not substantially outweigh the proffered mitigating evidence. In *Porter*, the undiscovered case in mitigation included evidence of the defendant's "heroic military service" during the Korean War, his resulting brain abnormality and educational difficulties, his struggles to regain normality upon return from war, and his childhood history of physical abuse. 130 S. Ct. at 454. The aggravating evidence, on the other hand, was limited to three factors: that the defendant was previously convicted of a violent felony, that the murder was committed during a burglary, and that the murder was committed in a cold, calculated, and premeditated manner. *Id*. In this case, the scale tips more heavily toward aggravation: the jury found ten aggravating factors, including a much more extensive criminal history, and Williams presented a less compelling case in mitigation.

The evidence presented in this case is more similar to the record in two cases where the Supreme Court, applying AEDPA, has rejected challenges to state court decisions finding no prejudice under *Strickland*. In *Woodford v. Visciotti*, the Court denied relief despite substantial, undiscovered mitigating evidence of the petitioner's dysfunctional family background and psychological abuse, because the jury was presented with strong aggravating evidence, including that the murder was an execution-style killing during a preplanned armed robbery, and that the defendant had been convicted of several prior violent crimes. 537 U.S. at 26. In *Cullen v. Pinholster*, the Court denied relief, relying on its view that the proffered mitigating evidence was of questionable value. New testimony from a psychiatrist would have opened the door to rebuttal testimony, and new evidence of the defendant's dysfunctional family—serious substance abuse, mental illness, and

-21-

criminality—might have caused the jury to conclude that the defendant was beyond rehabilitation. 131 S. Ct. at 1409-10.[4]

The record in this case also resembles the record in *Link v. Luebbers*, 469 F.3d 1197, where this court denied relief on a claim of ineffective assistance. The petitioner in *Link* presented substantial undiscovered mitigating evidence similar to the evidence presented by Williams: several instances of physical, sexual, and emotional abuse during the defendant's childhood; alcohol and drug abuse beginning during adolescence; and a diagnosis of post-traumatic stress disorder. *Id.* at 1201. The State in *Link*, as here, presented a strong case in aggravation, which included the defendant's extensive criminal history involving multiple rapes and several other violent crimes. *Id.* at 1200-01. Viewing the record as a whole, and assessing the significance of the new mitigating evidence, this court concluded that "the likelihood of a different outcome had the evidence been presented is not sufficient to undermine our confidence in the verdict reached by the jury." *Id.* at 1205. It was reasonable for the state courts to reach the same conclusion here.

*       *       *

---

[4]In *Williams v. Taylor*, 529 U.S. 362, the Court held that the petitioner was entitled to relief on his *Strickland* claim, but four Justices did not apply a deferential standard of review under AEDPA, and simply reached an "independent judgment" that there was a reasonable probability of a different outcome. *Id.* at 387, 399 (opinion of Stevens, J.). Only two Justices concluded that the state court unreasonably applied *Strickland* under the interpretation of § 2254(d)(1) that we must follow. *Id.* at 416 (opinion of O'Connor, J.). Williams also relies on *Sears v. Upton*, 130 S. Ct. 3259 (2010), *Rompilla v. Beard*, 545 U.S. 374, *Wiggins v. Smith*, 539 U.S. 510, and *Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002), but the prejudice analysis in those cases was not governed by the deferential review that applies under AEDPA.

The Supreme Court of Missouri ruled that Williams did not establish prejudice resulting from allegedly deficient performance by trial counsel. For the foregoing reasons, we conclude that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. The district court did not consider the prejudice question through the deferential lens of AEDPA, and this was reversible error. The judgment is reversed, and the case is remanded with directions to dismiss the petition for writ of habeas corpus and to enter judgment for the respondent.

MELLOY, Circuit Judge, dissenting.

The majority concludes that, even assuming the state court unreasonably applied the first prong of Strickland v. Washington, 466 U.S. 668 (1984), we must defer to their determination that no prejudice occurred under AEDPA. Because I believe the state court's prejudice determination was based on both an unreasonable application of clearly established federal law and an unreasonable determination of the facts, I dissent.

I disagree with the majority's articulation of the AEDPA standard to evaluate the question of prejudice related to counsel's failure to investigate and present mitigating evidence about Williams's troubled background. The majority concludes that it *would have been* reasonable for a state court to determine that the mitigating evidence was outweighed by the aggravating factors of Williams's crime. However, that is not what the state court determined. The state court decided that the mitigating evidence would have been inconsistent with the theory counsel actually presented at sentencing. The state court thus concluded that Williams was not prejudiced by counsel's failure to present that evidence *because* the evidence was inconsistent with counsel's penalty-phase strategy, even though the strategy was not adopted after a constitutionally sufficient investigation into Williams's background. The state court's prejudice determination is, in this respect, both an unreasonable application of

-23-

Strickland and based on an unreasonable determination of the facts. The state court's judgment cannot survive § 2254(d) analysis simply because, as the majority concludes, "a reasonable state court" might have determined for a different reason that Williams was not prejudiced. Furthermore, the cases cited by the majority do not support such a broad proposition.

I describe this disagreement in more detail below. However, because my conclusion requires a finding that Williams established the first Strickland prong, and because the majority merely assumed that the first prong was met for the sake of analysis, I first set forth further procedural history relevant to Williams's claim.

## I. Background

On May 30, 2003, Williams filed for postconviction relief pursuant to Supreme Court of Missouri Rule 29.15, alleging, *inter alia*, several instances of ineffective assistance of counsel. The only issue directly relevant to the current appeal was Williams's claim that counsel failed to investigate and present evidence that he was the victim of an abusive childhood and that he suffered from mental deficiencies. In support of this argument, Williams offered the affidavit of Dr. Cross, who described how family members and a church deacon sexually abused Williams as a child, how Williams grew up in a violent household with repeated physical abuse, how he suffered from borderline mental retardation before dropping out of school, and how he grew up and dealt with issues of mental illness, such as post-traumatic shock, depression, and drug addiction. Attorney Joseph Green, who handled the penalty phase of Williams's trial, later stated that counsel was not aware of the details of abuse contained in Cross's affidavit.

The state postconviction motion court granted an evidentiary hearing for Williams's postconviction appeal, but limited the testimony to Williams's claim that counsel was ineffective for failing to allow him to testify. The court did not grant

-24-

Williams's motion for a hearing specific to the new mitigation evidence. Despite this limitation, some of the testimony happened to be directly relevant to his failure-to-investigate claim, though the evidence on that issue was not fully developed on the record. During the hearing, both Green and co-counsel Chris McGraugh testified about the strategy used during trial and sentencing. In addition, Williams submitted a deposition that indicated what he would have testified to at sentencing. Green explained that counsel "had several theories at penalty phase. We had some that were developed and some that were underdeveloped." Post Conviction Relief Hr'g Tr. at 93:18–20, Mar. 12, 2004. Green described the central theory as "residual doubt," though they also tried to demonstrate Williams's positive impact on his family. Green indicated that he had wanted to demonstrate Williams's ability to adjust to incarceration, but never fully developed that theory.

At the hearing, Green was not asked about Dr. Cross's affidavit. Green was asked about Williams's deposition, which included statements about an abusive childhood, but Green had not read Williams's deposition before the hearing. Green testified generally about the importance of using social and mental history as mitigating evidence during sentencing—in Green's experience, he found that this evidence was important to humanize a defendant—but Green never demonstrated any knowledge about Williams's abusive childhood.

On cross-examination, the state asked Green whether evidence of an abusive childhood might have conflicted with the residual doubt strategy used during sentencing. Green's answers indicate that he did not see a direct conflict.

> Q:   Now, with residual doubt as a theory in the second phase, aren't you then going to try and portray the Defendant in the most favorable light to the jury as you can? In other words, you don't want to portray him as being a mean, spiteful, vengeful angry-type person, do you, having been abused as a child?

A:     Okay.  In my mind, those are two different questions.

Id. at 123:5–12.  Rather than describe evidence of abuse as something that would create problems for his theory at sentencing, Green suggested that "[t]here's a number of different ways [evidence of abuse] can be used in mitigation."  Id. at 138:24–25. Williams's postconviction counsel asked Green generally about why information about abuse would be important during sentencing:

Q.     And the fact that Marcellus testified about abuse in his deposition, I know you haven't read that, would that be something that you would want the jury to hear, that the abuse may have had something to do with his later behavior if you had an expert to testify to that?

A.     Yes, if I could show a nexus, yes.

Q.     And why would that be important?

A.     Well, if it—why it would be important to show the nexus?

Q.     Yes, for the jury to hear this.

A.     Oh, sure.  It gives an explanation as to how he became to be the person that they see before them, you know, and that to some extent to give the jury an understanding that had maybe society or the government or somebody interceded before at that point, we may not be here today.

Or another way is to give the jurors an explanation that if it is an abuse problem, now that it's been identified as a problem — this to this individual, a doctor may testify that now we have been able to identify the cause of it we can start treating it and alleviate this problem.  There's a number of different ways that can be used in mitigation.

Q.    But did you explore those ways in Marcellus' case, or did you want to?

A.    I—well, I definitely wanted to explore them, and to what extent we explored them, I think we made an attempt to do that; but I don't think we finished our attempt, though.

Id. at 138:2–139:6. On re-cross, the state again tried to question whether describing a defendant as a victim of abuse as a child would conflict with a residual doubt strategy:

Q.    If you went into the abuse to explain to the jury, well, maybe if it wasn't for all the abuse as a child maybe we wouldn't be here today, what you're doing is—aren't you conceding that he committed the murder?  As a result of this abusive background you allege?

A.    If you take that position with it, right.  If you're trying to explain who the person is that's before them today, I think is the wording I used, and it doesn't necessarily mean that you're conceding the murder.  If you're just saying this is why—because you have all this other criminal history that's before the jury.

      So if you're just to say why is this a guy who constantly finds himself incarcerated and charged with crimes?  Well, because he has an addiction problem, or because he's been abused and has a frontal lobe problem or, you know, whatever the reason may be. It doesn't necessarily mean you're conceding the act of guilt for the murder; it just explains the person who sits before you.

Id. at 139:20–140:13.  All of the questions put to Green about childhood abuse, and all of Green's answers, appear to be hypothetical.  Green does not discuss Williams's abusive childhood in particular, and none of Green's answers suggest he knew of any details of abuse.

During the hearing, Green also testified that he had hired a mitigation expert, Jeff Eno, to obtain child development and family history. Green described Eno as the man who helped set up his interviews with Williams's family members. Green also testified that Eno helped him "get some child development and family history," id. at 93:14–15, but there is no indication that either Eno or Green learned anything about the abusive childhood or mental retardation described in Cross's affidavit. Green also said that he hired a psychologist, Mark Cunningham, to diagnose Williams's future dangerousness. There is no indication, however, that Cunningham investigated or knew about Williams's abusive childhood. See id. at 100. It does appear that Green knew something about Williams's history of trouble in school, but he did not offer a reason for not pursuing that possible mitigating evidence.

> Q.      As you were aware that Marcellus had problems in school as early as kindergarden [sic], would it have been helpful to have expert testimony to explain Marcellus's behavior before going to prison and as a child growing up and what was involved in those?
>
> A.      Yes, that always can be a hedge.
>
> Q.      Did you have a strategic reason for not seeking that type of evidence?
>
> A.      As I sit here now, I can't think of any.

Id. at 100:20–101:3.

After the hearing, the state motion court denied Williams's motion to vacate the judgment and sentence. The motion court appeared to accept the truth of Dr. Cross's affidavit, but did not discuss the affidavit's particulars. The court considered the issue of childhood abuse to be mooted by Green's chosen strategy during sentencing. The motion court found that evidence of abuse "would have defied trial counsel's reasonable trial strategy of presenting Movant as a family man, who is innocent of such a violent murder." State's Ex. 33 at 802 (hereinafter "Postconviction Order").

-28-

The court stated that Williams was not permitted to argue a different theory would have worked better and that "there is no reasonable probability that the omitted evidence would have changed the result of Movant's sentencing." Id. at 802–03.

Williams then filed a motion for reconsideration and offered a sworn affidavit from Green about what Green would have testified to had Williams been allowed to address the failure-to-investigate claim. Green stated that he "ran out of time" investigating Williams's case because of his work on another capital trial at the same time. Green Aff. at ¶ 35. Acting as sole counsel in the other capital case, Green "had to prepare for trial during the same period I was preparing for Marcellus'[s] trial," and because a motion to continue Williams's trial was denied, Green admitted that he "did not have sufficient time to thoroughly prepare for Marcellus'[s] trial." Id. at ¶ 23–24. Green stated that he had reviewed Dr. Cross's affidavit and that, had he obtained Dr. Cross's diagnosis during Williams's penalty-phase case, he would have put it before the jury. Green stated that such evidence would have been important because "it would have provided explanations for his prior criminal history" and would have presented him in "a more sympathetic picture . . . than the facts surrounding the crime." Id. at 31–32. The motion court struck Green's affidavit, finding it to be an improper attempt to expand the record.[5]

The Supreme Court of Missouri affirmed the motion court's denial of relief. The court predicated its decision on the rule that "[t]he selection of witnesses and evidence are matters of trial strategy, virtually unchallengeable in an ineffective assistance claim." Williams v. State, 168 S.W.3d 433, 443 (Mo. 2005). The Supreme Court of Missouri then approved the lower court's reasoning, and stated: "The motion court found that an abusive childhood defense would have been

---

[5]The state argued below that, because it was struck by the state motion court, this affidavit was not properly part of the record. At oral argument, however, the state conceded that the affidavit appeared to be part of the record considered by the Supreme Court of Missouri and is thus properly part of the record before us.

inconsistent with the penalty phase strategy and would not have changed the jury's sentence. The motion court did not clearly err in denying this claim without an evidentiary hearing." Id. The Supreme Court of Missouri did not address whether counsel had or had not met its duty to investigate.

## II. Ineffective Assistance

As the majority noted, the state motion court concluded that Williams's counsel had employed a reasonable penalty-phase strategy and that Williams could not establish ineffective assistance of counsel by arguing that a different strategy would have worked better. The Supreme Court of Missouri similarly concluded that the presentation of evidence was "virtually unchallengeable" as a matter of trial strategy. Id. at 443. However, for a state court to conclude that counsel reasonably employed a strategy without assessing whether that strategy was supported by thorough investigation—or a reasonable and informed decision to cut short a thorough investigation—is an unreasonable application of Supreme Court precedent. A finding in this case that there was either a thorough investigation or an informed decision to cut short such an investigation would be an unreasonable determination of the facts. The Supreme Court of Missouri's decision that counsel's performance was not deficient thus fails either prong of § 2254(d).

### A.    *Reasonable trial strategy must be based on thorough investigation*

It is unassailable that under the prevailing professional norms at the time of Williams's trial, counsel had an "obligation to conduct a thorough investigation of the defendant's background." Williams v. Taylor, 529 U.S. 362, 396 (2000) (hereineafter "Terry Williams"); Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). While it may be proper for counsel to choose not to investigate all claims that a defendant urges him to advance if counsel believes such

-30-

claims to be meritless, the Supreme Court has explained that "strategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690–91. "[I]f limiting the investigation was not reasonable, then neither was the subsequent strategic choice. '[S]trategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel.'" Antwine v. Delo, 54 F.3d 1357, 1367 (8th Cir. 1995) (quoting Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir. 1991)). This duty was especially important in Williams's case, where the prosecution had indicated from the start that they would pursue the death penalty. See Antwine, 54 F.3d at 1367 ("'Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake, we believe that it was [counsel's] duty . . . to collect as much information as possible about [the defendant] for use at the penalty phase of his state court trial.'" (quoting Hill v. Lockhart, 28 F.3d 832, 845 (8th Cir. 1994))).

Neither the Supreme Court of Missouri, nor the motion court that it affirmed, discussed the clearly established federal law about counsel's duty to investigate. This is not, in itself, a problem. The Supreme Court has stated that § 2254(d) does "not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam). However, both state courts clearly applied a standard concerning the *introduction* of mitigating evidence at trial—a strategic decision—rather than the *investigation* of that evidence in the first place—a constitutional duty. This is an unreasonable application of Strickland.

Strickland did say that strategic decisions were "virtually unchallengeable." What the Supreme Court actually said in full, however, was that "strategic choices *made after thorough investigation of law and facts relevant to plausible options* are virtually unchallengeable; and strategic choices *made after less than complete investigation* are reasonable precisely to the extent that reasonable professional

-31-

judgments support the limitations on investigation." 466 U.S. at 690–91 (emphasis added). Strickland makes it clear that the reasonableness of a strategic decision is dependent on the reasonableness of counsel's investigation into possible mitigating evidence. Furthermore, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." Id. at 691.

The Court further explained the analysis of strategic decisions and reasonable investigations in Wiggins v. Smith, 539 U.S. 510 (2003). There, the Court applied AEDPA deference to a similar state-court rejection of relief where "the Maryland Court of Appeals appears to have assumed that because counsel had *some* information with respect to petitioner's background . . . they were in a position to make a tactical choice not to present a mitigation defense." Id. at 527. The Court explained, however, that such a choice could not be based on assumptions about counsel's investigations; a court must first assess the reasonableness of an attorney's investigation by considering,

> not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. . . . Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

Id. Wiggins makes clear that a state court's failure to assess the reasonableness of counsel's investigation of possible mitigating factors meets the AEDPA "unreasonable application" prong. Id. at 528 ("The Court of Appeals' assumption that the investigation was adequate thus reflected an unreasonable application of Strickland. As a result, the court's subsequent deference to counsel's strategic decision not 'to present every conceivable mitigation defense,' despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable." (internal citations omitted)). By

-32-

failing to analyze the reasonableness of counsel's investigation, both the Supreme Court of Missouri and the state motion court failed to apply clearly established federal law.

### B. The record does not reflect a constitutionally sufficient investigation

Even if the Supreme Court of Missouri had not unreasonably assumed that counsel met its constitutional duty to investigate in Williams's case and had specifically found that a sufficient investigation supported a decision not to introduce evidence about Williams's childhood, such a finding would be an unreasonable determination of the facts under § 2254(d)(2). There is no evidence in the record that counsel chose to avoid evidence of an abusive childhood or mental deficiencies at sentencing. Green testified about his intent to conduct investigation about Williams's history, but he admits that he was not able to complete this investigation—in his words, he "ran out of time." Even when confronted with the state's view that evidence of Williams's abusive childhood might conflict with other evidence Green offered at sentencing, Green testified that he thought evidence of abuse still could have been useful, had he been aware of it at sentencing. Green's testimony at the hearing and his later affidavit both support the district court's conclusion that counsel's family-man/residual-doubt strategy became a strategy by default and was not adopted after a reasonable decision to avoid evidence of Williams's childhood.

The state argues on appeal that counsel *did* investigate Williams's social history, and therefore counsel's decision not to present it at sentencing was part of a reasonable trial strategy. To support this argument, the state points to Green's hearing testimony, where he talked about Jeff Eno, the mitigation specialist he had hired, and Mark Cunningham, a psychologist. But the record does not demonstrate that either Eno or Cunningham presented Green with any evidence of Williams's abusive childhood. Even if Green did learn something about an abusive childhood, it would have been objectively unreasonable not to pursue such leads. In Wiggins, the Court

-33-

reviewed the performance of counsel who had *some* information about his client's social history; for example, a presentencing report and a report from the Department of Social Services that included information about the defendant's troubled childhood. The Court still found that it was "unreasonable in light of what counsel actually discovered" to not pursue those leads and expand the investigation of his social history.  539 U.S. at 525.

> When presented with *some* evidence of an abusive childhood,
>
> any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses. . . .   Indeed, counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless; this case is therefore distinguishable from our precedents in which we have found limited investigations into mitigating evidence to be reasonable.

Id. (citing, *inter alia*, Strickland, 466 U.S. at 699); see also Rompilla v. Beard, 545 U.S. 374, 389 (2005) (ineffective assistance where counsel failed to investigate mitigating information that would have been apparent from documents any reasonable attorney would have obtained).  Even if the state is right that counsel knew *something* about Williams's abusive childhood, it would have been unreasonable for the state court not to hold an evidentiary hearing to directly assess the reasonableness of counsel's decision not to investigate further.[6]

---

[6]The state argues that the record is underdeveloped and does not sufficiently demonstrate that Green had not investigated into or known about Williams's abusive past before adopting a his penalty-phase theory.  The state believes that "absent definitive evidence in the record of what trial counsel knew and when he knew it about Williams' actual childhood background . . . it is reasonable to conclude that the presumption that counsel acted within the wide range of professional competence has not been overcome."  Reply Br. at 13.  While I believe there is sufficient evidence in

Although it might be reasonable, after a thorough investigation of Williams's background, to decide to present Williams "as a family man, who is innocent of such a violent murder," instead of presenting evidence of his troubled childhood, Green never admitted to making such a decision. After denying Williams an evidentiary hearing on this issue, which could have revealed more details about counsel's actual decisions in preparing trial strategy, the state court merely assumed that such a decision had been made. "When viewed in this light, the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." Wiggins, 539 U.S. at 526–27; see also Harris v. Reed, 894 F.2d 871, 878 (7th Cir. 1990) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer.").

---

the record to affirmatively demonstrate that counsel's investigation was lacking, the state's argument can be rejected as contrary to Supreme Court precedent. Strickland established that, although "a heavy measure of deference to counsel's judgments" is due, any "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." 466 U.S. at 691. The state court denied Williams's request for an evidentiary hearing on his failure-to-investigate claim. Any absence of information in the record about counsel's decisions is not due to a lack of diligence on Williams's part. Deference to counsel's decisions would not justify the denial of an evidentiary hearing when the sufficiency of counsel's investigation is in question. See Sinisterra v. United States, 600 F.3d 900, 907 (8th Cir. 2010) (remanding a federal habeas claim for an evidentiary hearing because "counsel had an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present during the penalty phase of [petitioner's] trial. [Petitioner] argues that counsel failed to meet those obligations, and the record does not affirmatively refute the factual assertions upon which [petitioner's] claim is based." (internal citations omitted)).

-35-

## III. Prejudice

The majority concludes that, even if the Supreme Court of Missouri unreasonably applied federal law, we must defer to its decision that Williams was not prejudiced. I strongly disagree. Both state courts explicitly misapplied the first Strickland prong. Their prejudice determination was premised on this misapplication because both state courts failed to assess how a constitutionally insufficient investigation—rather than a conscious and informed decision not to introduce evidence—might prejudice a defendant. Furthermore, the state court erroneously concluded that the mitigating evidence could only have been introduced in conjunction with counsel's decision to present Williams as a family man who was actually innocent of the crime, even though Green directly contradicted this contention in an evidentiary hearing. Because the state court both unreasonably applied clearly established federal law and unreasonably determined the facts in light of the evidence presented in state proceedings, § 2254(d) does not bar habeas relief for Williams. Rather, Williams has established a reasonable probability that, but for his counsel's ineffective assistance, his sentence would have been different.

### A. *The majority misapplies the AEDPA standard*

Instead of reviewing whether the prejudice decision actually offered by the Supreme Court of Missouri was either an unreasonable application of clearly established law or rested upon an unreasonable determination of the facts, the majority looks at whether a reasonable state court *could have* concluded that Williams was not prejudiced by the deficiencies of counsel. Although such a standard of review is appropriate in some AEDPA cases, it is not appropriate in a case like this one, where a state court has clearly explained its decision on the merits; this is a subtle, but vitally important distinction.

-36-

The majority correctly states that "the proper question is whether there is 'any reasonable argument' that the state court's judgment is consistent with Strickland." Supra at 10. However, in determining what "judgment" should be considered, the majority distinguishes "decisions" from a state court's explanation of its reasons. This distinction comes from a line of cases that deal with how the AEDPA standard applies to state courts' summary, unexplained, or indeterminate denials, and does not justify ignoring reasons given by a state court to support its decision. Unlike in the cases cited by the majority, the present case does not involve a state court's failure to offer an explanation for its rejection of post-conviction relief, see Harrington v. Richter, 131 S. Ct. 770, 788 (2011); Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1254 (11th Cir. 2002), nor is it a case where a state court offered only "sparse or otherwise unsatisfactory" explanation for its decision, see Wright, 278 F.3d at 1254 n.2 (describing Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001) and Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997)). It is true that a petitioner challenging a summary or unexplained denial "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for" the state court decision. Cullen v. Pinholster, 131 S. Ct. 1388, 1402 (2011) (quoting Harrington, 131 S. Ct. at 784). However, unlike in the summary denial cases, we are here presented with an explicit decision by the state court that is an unreasonable application of clearly established federal law.

The majority cites no authority that would require—or for that matter, allow—us to cure this defect in the state court's reasoning by looking for some other reasonable basis upon which the state court could have denied Williams's claim. While AEDPA may not require state courts to explain their decisions, it does not allow federal courts to ignore a state court's explanation that fails to meet the AEDPA standard. See Harrington, 131 S. Ct. at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [i.e., where the state court provided no rationale], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments

-37-

or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.")[7]; Packer, 537 U.S. at 8 (noting that § 2254(d) does "not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, *so long as neither the reasoning nor the result of the state-court decision contradicts them*." (emphases added)); Wright, 278 F.3d at 1256 n.3 ("The failure of a state court to set out its reasoning is not equivalent to the conspicuous misapplication of Supreme Court precedent."); Johnson v. Sec'y, DOC, 643 F.3d 907, 930 n.9 (11th Cir. 2011) (noting that "[t]he Court's instruction from Harrington" that a petitioner must show there was no reasonable basis for a summary denials "does not apply here because the Florida Supreme Court did provide an explanation of its decision")[8]. To defer to a hypothetical conclusion rather than the conclusion actually

[7]The state argues that Harrington requires us to ask whether fairminded jurists could disagree that there was no prejudice in this case. This argument makes the same mistake as that in the majority's holding. Instead, Harrington requires us to ask whether fairminded jurists could disagree that the arguments or theories supporting the state court's decision were inconsistent with clearly established federal law, as decided by the Supreme Court. See 131 S. Ct. at 786.

[8]In fact, in Johnson, the Eleventh Circuit determined that de novo review of prejudice was required given the Florida Supreme Court's unreasonable application of the deficient-performance prong of Strickland. Johnson stated in full:

The Supreme Court's recent decision in Harrington, where the state supreme court had issued a summary order denying relief, tells us that "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." The Court's instruction from Harrington does not apply here because the Florida Supreme Court did provide an explanation of its decision which makes clear that it ruled on the deficiency prong but did not rule on the prejudice prong, and it is also clear that the trial court's ruling on the prejudice prong did not address counsel's investigation and presentation of non-statutory mitigating circumstances evidence. Johnson II, No. CR 80–101 at 3–4. As a result, we are still required to follow the Court's

-38-

offered by the state court, as the majority now does, is to create an even more heightened standard than has been previously acknowledged in AEDPA cases.

The majority asserts that <u>Premo v. Moore</u>, 131 S. Ct. 733 (2011), supports its position that deference to unstated hypothetical conclusions is required even in the face of clearly articulated but unreasonable applications of Supreme Court precedent. The United States Supreme Court in <u>Premo</u>, however, expressly characterized the state-court judgment under review as being indeterminate in its rationale. <u>Id.</u> at 740 ("The state court did not specify whether this [rejection of a <u>Strickland</u> claim] was because there was no deficient performance under <u>Strickland</u> or because Moore suffered no <u>Strickland</u> prejudice, or both."). The Supreme Court did not suggest that it was disregarding a state court's articulation of an unreasonable application of clearly established Supreme Court precedent. In fact, nothing in the lower state court opinion in the <u>Premo</u> case as quoted by today's majority seems to suggest an unreasonable application of any Supreme Court precedent. In any event, I find it unnecessary to look behind the Supreme Court's own clear characterization of the state court record in <u>Premo</u>.

Notwithstanding the extensive discussion of <u>Premo</u>, then, the fact remains that the majority today expands the scope of AEDPA deference beyond the limits previously imposed by statute or by Supreme Court precedent. Even if the majority is correct that this newly articulated and greater degree of AEDPA deference may someday become the next step in the Supreme Court's habeas jurisprudence, I do not share the majority's willingness to pioneer a path for this type of broader sanctioning of unreasonable applications of existing law. I believe instead that the Supreme Court itself should be the source of such new statements of law and that lower courts

---

instructions from <u>Rompilla</u> and <u>Wiggins</u> and conduct a de novo review. 643 F.3d at 930 n.9 (internal citation omitted).

and intermediate courts like ours should be not only transparent in our actions when we step ahead of the Court's rulings, but hesitant to take such steps.

Here, Williams's claim for post-conviction relief was clearly adjudicated on the merits by the Supreme Court of Missouri. The state court clearly concluded that Williams was not prejudiced by his counsel's performance. The reason offered for this conclusion is equally clear: "The motion court found that an abusive childhood defense would have been inconsistent with the penalty phase strategy and would not have changed the jury's sentence. The motion court did not clearly err in denying this claim . . . ." 168 S.W.3d at 443; see Postconviction Order at 802 ("This evidence would have defied trial counsel's reasonable trial strategy of presenting Movant as a family man, who is innocent of such a violent murder. Movant cannot now plead ineffective assistance alleging that a different strategy would have worked better."). As explained above, this reasoning about "reasonable trial strategy" is based on an unreasonable application of Strickland.

> B. *The Supreme Court of Missouri failed to consider how a deficient investigation could prejudice a defendant*

The fact that the state courts correctly recited Strickland's prejudice standard, as identified by the majority, supra at 10, does not satisfy our review of whether the state court reasonably applied that standard. See Sears v. Upton, 130 S. Ct. 3259, 3264 (2010) ("Although the court appears to have stated the proper prejudice standard, it did not correctly conceptualize how that standard applies to the circumstances of this case."). Here, the state court's prejudice determination reflects a misunderstanding about how counsel's failure to investigate affected the penalty-phase strategy to begin with.

-40-

Wiggins makes clear that it is objectively unreasonable for a state court to defer to a "strategic decision" unsupported by reasonable investigation. 539 U.S. at 528.[9] Furthermore, the reasonableness of a penalty-phase strategy is irrelevant to whether the investigation supporting it was reasonable. Sears, 130 S. Ct. at 3265 n.10 ("[T]he reasonableness of the theory is not relevant when evaluating the impact of evidence that would have been available and likely introduced, had counsel completed a constitutionally adequate investigation before settling on a particular mitigation theory.") Yet the prejudice determination of both state courts deferred to what they considered a reasonable mitigation strategy, despite not considering the adequacy of the investigation supporting that strategy.

Both courts viewed the theory that was actually presented at sentencing as a reasonable one and concluded that Williams was not permitted to "plead ineffective assistance alleging that a different strategy would have worked better." Postconviction Order at 802; 168 S.W.3d at 443 (declining to review counsel's trial strategy because it was "virtually unchallengeable in an ineffective assistance claim"). Thus, instead of weighing the mitigating evidence against the aggravating factors, as

_____

[9]The majority does not believe that Wiggins is relevant to our review of the state court prejudice determination because the review of Strickland's second prong in Wiggins was not governed by AEDPA deference. Supra at 22 n.4. While I would agree that any case offering de novo prejudice review would provide poor guidance under a "no reasonable basis" standard, see, e.g., Cullen, 131 S. Ct. at 1410–11 (discounting the usefulness of de novo prejudice reviews in determining reasonableness of a summary habeas denial), that is not the proper standard for a case where a state court affirmatively misapplies clearly established federal law. Wiggins is important to our review because it demonstrates how a failure to investigate affects a penalty-phase strategy. Had the state courts not affirmatively misapplied Supreme Court precedent and still concluded that no prejudice occurred, I would agree that § 2254(d) would prevent us from granting habeas relief. Because both state courts based their prejudice determination on a misunderstanding of the first Strickland prong that Wiggins declared objectively unreasonable under deferential AEDPA review, see 539 U.S. at 527, Wiggins is relevant to our prejudice analysis.

the majority now does, both state courts considered only whether the new mitigating evidence could have fit within the family-man/residual-doubt theory that was actually offered. The state motion court concluded that evidence of Williams's troubled childhood would have "defied trial counsel's reasonable trial strategy" because it would have "been tantamount to a concession of guilt" and portrayed him as "angry, aggressive, and violent." Postconviction Order at 802. The Supreme Court of Missouri agreed with the motion court that such a portrayal "would have been inconsistent with the penalty phase strategy and would not have changed the jury's sentence." 168 S.W.3d at 443.

This is not only an unreasonable deference to an unreasonable strategy based on unreasonable investigation, but it is also contradicted by counsel's own testimony. The motion court concluded that offering the new mitigation evidence "would have been tantamount to a concession of guilt," and thus would have "defied" counsel's strategy; however, Green testified before that court that introducing evidence of Williams's troubled background wouldn't "necessarily mean you're conceding the act of guilt for the murder; it just explains the person who sits before you." Hr'g Tr. at 140:11–13.[10] This is also contrary to Supreme Court precedent. See Wiggins, 539 U.S. at 535 ("While it may well have been strategically defensible upon a reasonably thorough investigation to focus on [defendant's] direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive.").

Furthermore, the assumption that the mitigation evidence would "defy" or be "inconsistent with" the strategy employed by counsel at sentencing unreasonably assumes that this evidence could only have been introduced in concert with the family-man/residual-doubt theory, even though a thorough investigation into

_____

[10] It is not a reasonable determination of the facts for the court to concoct a decision between two purportedly-mutually-exclusive options when counsel never testified to making such a decision. See Wiggins, 539 U.S. at 526–27; Harris, 894 F.2d at 878.

-42-

Williams's background might have persuaded counsel to offer the new mitigation evidence instead of the theory that was actually presented. See Wiggins, 539 U.S. at 535 (noting that "a reasonable attorney might well have chosen to prioritize the mitigation case over" the doubt strategy actually employed at sentencing). The fact that neither state court considered this possibility is further evidence of a failure to recognize the importance of a thorough and competent investigation as required by Strickland. This is why the state court determination that no prejudice occurred is both an unreasonable application of Strickland, as well as an unreasonable determination of the facts.

> C.     *We must weigh de novo the mitigating evidence against the aggravating factors*

The majority may be correct that it would have been reasonable for the state court to conclude that there was not a reasonable probability that the new mitigating evidence would have changed the outcome of Williams's trial. The case against Williams was strong. In light of the state court's unreasonable application of Strickland, however, we do not defer to what a reasonable state court might have decided. Instead, we must now conduct a de novo review of whether Williams suffered prejudice. See Johnson, 643 F.3d at 930 n.9 (de novo review of prejudice is required where there has been an unreasonable application of Supreme Court precedent); see also Frantz v. Hazey, 533 F.3d 724, 739 (9th Cir. 2008) (en banc) ("To identify a § 2254(d)(1) 'contrary to' error, we analyze the court's actual reasoning . . . . Identification of such an error is not the end of a federal habeas court's analysis . . . . Instead, pursuant to § 2254(a) and pre-AEDPA standards of review, we must also evaluate de novo the petitioner's constitutional claims, without limiting ourselves to the reasoning of the state court."); Young v. Sirmons, 486 F.3d 655, 674 (10th Cir. 2007) ("Because the [state court] applied a legal principle that is contrary to clearly established federal law in evaluating [Petitioner's] ineffective assistance claim—as

-43-

the state concedes—no deference is given to the [state court's] decision under 28 U.S.C. § 2254(d). Thus, the district court properly reviewed this claim de novo.").

In assessing whether Williams was prejudiced by his counsel's deficient performance, we must ask "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. This review "do[es] not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" Porter v. McCollum, 130 S. Ct. 447, 455–56 (2009) (quoting Strickland, 466 U.S. at 693–94). "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534.

In his post-conviction appeal, Williams submitted evidence that he was sexually abused as a child, that he grew up in a violent household with constant physical abuse, that he suffered from borderline mental retardation before dropping out of school, and that he grew up and dealt with issues of mental illness, such as post-traumatic shock, depression, and drug addiction. Had the jury been presented with mitigating evidence of Williams's abusive childhood and mental impairments instead of the family-man/residual-doubt strategy that was actually offered at sentencing, it would have been considering evidence of a completely different character than that which it actually considered. This is not a case where the newly discovered mitigation evidence was merely duplicative of evidence that was presented, see Paul v. United States, 534 F.3d 832, 842 (8th Cir. 2008), or where the post-conviction court disbelieved the evidence favorable to the defendant, see Roll v. Bowersox, 177 F.3d 697, 700–01 (8th Cir. 1999). This is not a case where the new evidence "would barely have altered the sentencing profile presented to the sentencing judge." Strickland, 466 U.S. at 700. The court does not have to determine whether the evidence would have more likely than not altered the outcome; it need

-44-

only establish a probability sufficient to undermine confidence in the outcome. Porter, 130 S. Ct. at 455–56. I believe Williams has demonstrated sufficient evidence to undermine that confidence.

The state now argues that the new mitigating evidence is of only negative value. The state believes that the evidence of his abusive and violent childhood would portray Williams as a bad man, an irredeemable monster. It is possible that a jury might adopt the state's interpretation of the evidence; however, that interpretation conflicts with longstanding Supreme Court views on the use of such evidence. See Terry Williams, 529 U.S. at 398 (noting that a "graphic description of [defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability"); Penry v. Lynaugh, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002).

I agree with the district court that, "[i]n light of the overwhelming amount of aggravating evidence that was proffered by the state, the jury would not think worse of Williams based on evidence of his dysfunctional youth and mental issues." Order at 32; see also Simmons v. Luebbers, 299 F.3d 929, 938–39 (8th Cir. 2002) ("By the time the state was finished with its case, the jury's perception of [Defendant] could not have been more unpleasant. Mitigating evidence was essential to provide some sort of explanation for [Defendant's] abhorrent behavior."). Indeed, even if some of the mitigating evidence might have proved harmful to Williams in the end, that does not prevent us from finding there is a reasonable probability that the evidence would have changed the outcome of his sentence. See Terry Williams, 529 U.S. at 396 (finding prejudice even though "not all of the additional evidence was favorable to"

the defendant); see also Porter, 130 S. Ct. at 455 (rejecting as unreasonable a state court's determination that negative aspects of petitioner's military history would undermine positive aspects of mitigating evidence).

The majority is correct that the state presented strong aggravating evidence against Williams. I agree with the majority that the mitigating factors in Williams's case may not be as strong as those in Porter, nor the aggravating factors as weak. However, because the other cases compared by the majority applied a deferential "any reasonable basis" standard that is not appropriate for this case, those cases are not useful guides for determining whether the evidence in this case is sufficient to undermine our confidence in the outcome. For instance, this case is wholly unlike Woodford v. Visciotti, 537 U.S. 19 (2002), where the Supreme Court deferred to a state-court decision that the petitioner suffered no prejudice from counsel's inadequacy in the face of the aggravating factors the state court explicitly described as "overwhelming" and "devastating." Id. at 26.[11] Although the majority now weighs the mitigating evidence against the aggravating factors in Williams's case, it does this in the first instance.

Nor is this case like Cullen v. Pinholster, where the state-court decision was nothing more than a summary denial. Because the state court had not explained its decision in that case, the petitioner could "satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the California Supreme Court's decision." 131 S. Ct. at 1402 (quoting Harrington, 131 S. Ct. at 784).

---

[11]Similarly, Link v. Luebbers, 469 F.3d 1197 (8th Cir. 2006), also cited by the majority, dealt with a state court that explicitly weighed the new mitigating evidence against the aggravating factors and concluded that there was no reasonable probability that a jury would have come to a different result had the mitigating evidence been introduced. Id. at 1204. Link is thus distinguishable for the same reason as Woodford.

Unlike in <u>Cullen</u> or <u>Harrington</u>, the state court in Williams's case did not issue a summary denial or fail to explain its reasoning for finding no prejudice.

I believe the more relevant cases for our prejudice review are <u>Wiggins</u>, <u>Rompilla</u>, and <u>Simmons</u>, which the majority dismisses as irrelevant because "the prejudice analysis in those cases was not governed by the deferential review that applies under AEDPA." <u>Supra</u> at 22 n.4. While it is true that those cases conducted de novo review of <u>Strickland</u> prejudice, they are more useful guides to us in the face of an objectively unreasonable state-court prejudice determination than are cases like <u>Woodford</u> or <u>Cullen</u>, where a petitioner failed to meet the standard set forth in § 2254(d). Because we need not defer to the state court's unreasonable application of <u>Strickland</u>, we still must decide in the first instance whether the ineffectiveness of Williams's counsel undermines our confidence that, but for counsel's deficient performance, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. I believe Williams, like the petitioners in <u>Wiggins</u>, <u>Rompilla</u>, and <u>Simmons</u>, has demonstrated sufficient evidence to undermine that confidence.

## IV. Conclusion

In his post-conviction appeal, Williams submitted evidence that he was sexually abused as a child, that he grew up in a violent household with constant physical abuse, that he suffered from borderline mental retardation before dropping out of school, that he grew up and dealt with issues of mental illness, such as post-traumatic shock, depression, and drug addiction. His appeal alleged that his trial counsel was ineffective for not investigating or presenting any of this possible mitigating information at sentencing. His counsel has stated that he did not know this information, that he would have used this information had he known it, and that he had no strategic reason for not using it. Based on clearly established federal law, counsel's performance was constitutionally ineffective.

The state-court determination that Williams was not prejudiced by counsel's failure to present this information is also objectively unreasonable. The Supreme Court of Missouri did not assess how a failure to investigate can undermine counsel's "strategic decisions" during the penalty phase. To find that Williams was not prejudiced because the new evidence would have "defied" or been "inconsistent with" the otherwise adopted strategy is an unreasonable conclusion based on an unreasonable premise.

The majority may offer a sensible explanation of why a hypothetical state court could have been reasonable if it had found the mitigating evidence offered by Williams might not have changed the outcome of his sentence. However, that explanation was not offered by either state court in this case. A reasonable hypothetical decision does not cure the objectively unreasonable explanation that the Supreme Court of Missouri did put forward, even under AEDPA's strict standard. Under a proper application of Strickland, I believe Williams has presented evidence that establishes a probability sufficient to undermine confidence in the outcome of his sentence. I would therefore affirm the district court's decision to grant the habeas petition.

_____